Good morning, Your Honors. My name is Evangeline Abreel, and I was appointed amicus curiae in this case. I'm sorry, we can't. Just a moment. Let's start again. We had some noise in the background. Could we start the argument again? Yes, Your Honor. Please speak up. My name is Evangeline Abreel, and I was appointed as amicus curiae in this case. Mr. Sprules, who represents Mr. Guerra, has ceded his time to me today, but he's here in the courtroom as well. Okay. Your Honor, this case presents the two-common scenario of an immigrant without resources and without a command of the English language who files an asylum application that does not adequately recount his experiences, and then later with representation and in a removal proceeding is able to more fully describe what happened to him. I'd like to address three points on this this morning. First, what the immigration judge characterizes as an omission from Mr. Guerra's asylum application is more accurately viewed as an incomplete application that the applicant is then later is able to supplement later in a removal proceeding. This omission should not support a finding of non-credibility. Second, the immigration judge failed to consider important corroborative evidence that Mr. Guerra submitted in the form of the scars on his hands. And third, the government's presentation of the 2002 State Department report on human rights practices in Guatemala does not provide the individualized assessment that is necessary to rebut a presumption of well-founded fear of persecution that arises from a showing of past persecution. Your Honors, credibility determinations are difficult ones, and this Court imposes a high standard of review on them, a substantial evidence standard. But the immigration judge's non-credibility determination must still meet certain requirements. It must list specific reasons for the finding, and it must give adequate consideration to the explanations offered by the applicant. In this case, the immigration judge did give specific reasons, so specific that this Court can review those themselves. But the immigration judge did not give adequate consideration to Mr. Guerra's explanations. The immigration judge was concerned about four specific things here. The first was that Mr. Guerra did not fully describe an incident in which he was detained for five days by guerrillas and tortured. He referred to it generally in his asylum application, but gave a much more specific description of it in his removal proceeding. Second, the immigration judge noted that testimony or non-responsiveness by Mr. Guerra to questions about whether he had told his attorney about this particular incident. Third, the immigration judge was concerned that the asylum officer's notes did not clearly reflect this particular incident. And fourth, the immigration judge was concerned that Mr. Guerra did not give specific information about the political party in which he participated in Guatemala. All except the first of these center on that one incident, when Mr. Guerra was detained for five days and tortured by the guerrillas. Mr. Guerra gave explanation as to why he did not give a fuller recitation of this in his asylum applications. I'm sorry, asylum application. He testified that at the time he did not speak English. He did not have the resources to hire counsel, and so he was assisted by a preparer, and there's no indication that that preparer was an attorney or an accredited representative. He was also 17 years old. He turned 18 on the day he filed his application. This court has cautioned against putting too much emphasis on discrepancies between initial asylum applications done by non-represented parties and testimony in a removal proceeding. And this court has said that those sorts of applications must be read charitably, especially when you're looking for a complete explanation of what happened to the individual. But even under these conditions, Mr. Guerra's asylum application does give some explanation as to what happened to him. At page 162 of the record, Mr. Guerra says, and in view the guerrillas were determined to capture me and to have me either taken to the hills to their headquarters or be killed in the place where I have lived. And because of the continued persecution from elements of the guerrillas and that they've been trying to capture me. Then at page 163, he states that he is now being hunted by the guerrillas for having served the government. So he does make reference to this trouble that he's having with the guerrillas because of his ‑‑ Counsel? Yes. Mr. Guerra is quite specific about some things in that application. For example, he refers to the fact that houses in the aldea of San Joaquin were destroyed, burned by the guerrillas and reprisal and so on. So he has provided us with some detail. Now that detail, of course, does not relate to him. It doesn't say my house was burned by the guerrillas. And so he files this ‑‑ he files this statement with some sort of general description of persecution that's really quite specific. Houses in San Joaquin were burned. And then not until his hearing after he's had an interview with the asylum officer, he's filed his application, he's been talking to his attorney, all of a sudden he comes up with all this detail that nobody has ever heard before about how he was captured and cut and so forth. What are we supposed to do when he provides us with detail in his application, omits all the references that are personal to him, and then comes up with a story later on after he's had an interview and talked with his attorney? What are we supposed to do with that? Your Honor, Mr. Guerra did give some explanation as to that. And it may ‑‑ the answer may be the preparer who prepared his application. That ‑‑ if the preparer was accustomed to representing Guatemalan applicants, the preparer may have put in some general information that came from the preparer, but didn't ask Mr. Guerra the specific questions that would have allowed him to give that specific information about Mr. Guerra's case himself. But he also has an interview with an asylum officer. And he's in the same sort of situation there, Your Honor, where he's being asked questions and he's not represented. And this Court has also cautioned against putting too much weight in discrepancies between an asylum interview and a removal proceeding. This Court has noted that the asylum interviews are quasi-prosecutorial proceedings, and that the applicant must provide his or her own interpreter. So we never know whether part of this is not just an interpretation problem. Yeah, but, you know ‑‑ I guess, Counsel, you're appearing pro bono on part of our pro bono program. Yes, Your Honor. Well, we very much appreciate your doing that. I guess the problem I have here is that we have all this law about deferring to credibility determinations. Aren't the arguments that you're making now really what the ‑‑ supposed to be resolved by the person who is making those credibility determinations? Yes, Your Honor. The judge does ‑‑ the immigration judge does make those determinations. But they are reviewed by this Court. Right. And if they are not based on a reasoned decision, then this Court overturns them. And here there's a good explanation for every single point that Mr. ‑‑ every thing that the immigration judge points to as a basis for noncredibility. But aren't we also bound, Counsel, by the fact that the I.J. heard those explanations and decided not to credit the explanations at the time? And that's not a judgment that we really can review particularly well on this kind of a record. That's correct, Your Honor. Mr. Guerra did make those ‑‑ did try to explain it then. But the immigration judge gave very short shrift to those explanations. And he also did not take into account some corroborative evidence that Mr. Guerra presented. And that was the form of the scars on his hands. If you look at page 104 of the administrative record, Mr. Guerra says, they cut part of my fingers. And you could see here the scars on my fingers and how it is now. And that's really important corroborative evidence. No one in the hearing gave a narrative description of what those scars looked like. But it was something that's proffered to the immigration judge for his consideration. And that would corroborate his story. Your Honor, to my third ‑‑ that was my second point, the corroborative evidence. On my third point, Mr. Guerra's testimony ‑‑ if Mr. Guerra's testimony is credible, then what he describes is persecution. And if he describes past persecution, then he has also ‑‑ he's entitled to a rebuttable presumption of a well‑founded fear of persecution in the future. And that can be rebutted only by showing ‑‑ by preponderance of the evidence that the conditions have changed in his country so that he could live there safely. This has not been done. The government presented the 2002 State Department report, but did not point to any specific place in that report. Neither did the immigration judge. They simply stated that peace accords were signed in 1996. There was no individualized assessment of how those ‑‑ Well, the BIA did ‑‑ or the IJA did cite the fact that his father remains in Guatemala. And he relied on the fact that his father was politically active for one of the reasons as to why he was being persecuted for political activity. And his father remains in Guatemala and has had no difficulty, apparently. That does seem to be the case from the record, Your Honor. But Mr. Guerra and Mr. Guerra's case and his father's case are quite different. Mr. Guerra's ‑‑ the principal reason for Mr. Guerra's fear and what happened to him was his involvement in the civil defense patrols, not his involvement in the political ‑‑ in the Unión Central Nacional that his father was the chief organizer for. He doesn't ‑‑ Mr. Guerra really doesn't put forth that his political party membership was the real basis for his problems. They were ‑‑ his problems came from his participation in the civil defense patrols. All right. Thank you. You have used your time. Thank you, Your Honor. Good morning. May it please the Court. My name is Arthur Rabin. I'm here on behalf of the Respondent, the Attorney General. Could you keep your voice up also? Okay. I'm sorry, Your Honor. I thought the microphone was working. The reason I would argue that there is no compelling evidence in this case to reverse the IJA's denial of asylum is because there are two bases for denial, each of which can stand on its own. First is credibility. As to credibility, the IJA found, and his finding is based on articulable compelling reasons, that the crux of Petitioner's claim here, that he was shot at on two occasions and that he was then captured by the guerrillas, detained, tortured allegedly, and then knocked unconscious and left on the side of the road, that is his claim. Yet that claim was never disclosed at three opportunities that he was given. One, he never said that in his written asylum application. He never said that to the asylum officer who questioned him thoroughly and whose assessment is in the record. And then he even admitted he never told that to his own attorney prior to coming to the hearing. And he would have this Court believe that his explanation is, nobody asked me about it. Nobody asked me. He said specifically, well, as to the preparer for my asylum application, well, he basically just wrote whatever he wanted to write, and I just signed it, despite the fact that as the Court pointed out, he does go into specifics, some specifics, in his asylum application. Moreover, the asylum application specifically asks him. It specifically asks him two things. One is, was he ever detained or interrogated? And he said no. He checked the box, no. Counsel, when Mr. Guetta entered the United States in 1993, didn't he apply for asylum almost immediately? Yes, Your Honor. That would be just a little unusual for some of our experience with people coming from Central and South America. Oftentimes we see them applying for asylum sort of as an afterthought once somebody's found them in the country. But he came in to the United States and applied for asylum immediately. Yes, Your Honor. What inference should we take from that? Well, Your Honor, I mean, it just may be that he met somebody that said, I can get you a work visa quickly by filing this asylum application, because one of the benefits you get from filing immediately is you get to work immediately. So that could be, you know, these are all speculations, of course, Your Honor. I don't know. So as far as to what  But the other point I wanted to make was that his asylum application specifically contradicts his testimony. Now, in his testimony, he testified that he was captured by the guerrillas, detained, and then tortured. Yet on page 162 of the record, in the asylum application, he specifically told the preparer, who then wrote, that the guerrillas were trying to capture him. Trying. That they never did, but they were trying. So that specifically actually contradicts his testimony. Moving on to what he told the asylum officer. The asylum officer in his assessment said, specifically asked him, why do you, this opened a question, why do you fear returning to Guatemala? And yet, never, never did he say, that is because I was beaten, detained, tortured, any of those things, to the asylum officer. Now, the IJA then also made an alternative, well, not an alternative, but a second ground for credibility. And that was implausibility. The IJA also found it implausible that Petitioner, who then, who also testified that he was a propagandist, as well as an assistant to his father and a coordinator, and quite active for this political party that he was, he said he was a member of, that he did not know what their platform was. He tested, he specifically asked on cross-examination, well, if you were such an active member that you said in your asylum application, I'm a very active member of this party, what did you stand for? What was your platform? Why were you trying to get people elected? He said, I don't know. I don't remember. It's been ten years. Completely implausible. Now, these were not minor omissions. These were material to his claim. I mean, these were his claim. Moving on to the second, the alternative finding the IJA made, which was burden. In this particular case, the IJA said, well, you have not established a well-founded fear of persecution in Guatemala because, one, as the court pointed out, your parents have remained there unharmed. They relocated successfully. Nothing's ever happened to them. And two, after you left, there was this peace accord signed between the guerrillas and the government. And since then, there has been no active, or at least according to the State Department report, no active guerrilla activity where these groups are organized and are roving the countryside, killing people, as they did in 1993. And this directly rebuts, or at least shows, material change in country conditions, which Petitioner never overcame and never showed why. I mean, he never even said who these guerrillas were. He never even said why he feared a specific group of guerrillas or showed any kind of specificity as to why he fears returning. Subject to the Court's questions. There don't appear to be any. Thank you. Is there anything that you wish to add very briefly? You have used your time, but we'll leave it there. Your Honor, just two points on rebuttal. And the first one was that I think counsel for the government said that Mr. Guerra had checked no when being asked if he had been detained in Guatemala on his asylum application. At page 163 of the record, in item number 22, he does check no, but the question here is whether you have been arrested, detained, interrogated, convicted, and sentenced and imprisoned, which to someone who was not familiar with these questions would look like an inquiry about a criminal background. He does answer yes in previous questions when he's asked whether he's ever been mistreated in Guatemala. And, Your Honor, the second point I wanted to make on rebuttal very quickly was that the immigration judge, the information presented by the government did not rebut the presumption of a well-founded fear of future persecution. There was no individualized assessment of how the 1996 peace accords might affect Mr. Guerra individually. There's nothing, no one pointed to any part of these, of the peace accords that indicated there was no active political, no active guerrilla activity in Guatemala right now. In fact, the 2002 report is actually to the contrary. It indicates that there is still a great deal of problems that the peace accords are not fully implemented and that the United Nations monitoring project is still in the country and has been asked to, was asked to remain by the Guatemalan government. Thank you. Thank you, Your Honors. The case just argued is submitted. Again, we thank counsel for the participation in the pro bono project. And we'll hear the next case, which is Sony Computer Entertainment America v. American Home Assurance.
judges: Schroeder, Hall, Bybee